UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

           v.                                20-CR-79-V

DEYANNA DAVIS,

                    Defendant.

_____

## GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO REVOKE THE MAGISTRATE JUDGE'S DETENTION DECISION AND ORDER

**THE UNITED STATES OF AMERICA,** through its attorneys, James P. Kennedy, Jr., United States Attorney for the Western District of New York, and Seth T. Molisani, Assistant United States Attorney, of counsel, hereby file this Memorandum of Law in Support of its Motion for Review of Magistrate Judge McCarthy's Decision and Order releasing the defendant upon conditions. Dkt. 29.

## I.      PROCEDURAL HISTORY

The defendant, DEYANNA DAVIS, along with co-defendants Semaj Pigram and Walter Stewart, are charged in a three-count Indictment with felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 2.[1] The Indictment was returned by a federal grand jury on June 4, 2020. Dkt. 1. The prosecution is premised on events which occurred on June 1, 2020. On June 18, 2020, arraignment of the defendant was held before the Hon. Jeremiah

---

[1] The defendant is charged under Count 1.

J. McCarthy, Magistrate Judge for the Western District of New York. At that time, the Magistrate Court inquired whether the Government was seeking detention of the defendant. The Government affirmed and moved for the defendant's detention and provided the statutory basis for seeking detention, specifically 18 U.S.C. § 3142(f)(1)(E) ("any felony that is not otherwise a crime of violence that…involves the possession or use of a firearm…").

Following an adjournment of the detention proceeding at the defendant's request, a detention hearing was commenced on June 23, 2020. The Government proceeded by proffer and offered videos and photographs in support of its position to detain the defendant pending trial based upon the danger she posed to the community should she be released. The Government argued that it had established by clear and convincing evidence that the defendant presented a danger to the community. Following its own independent assessment of the facts and circumstances of this case and the defendant's background, the United States Probation Office ("USPO") issued a Pretrial Services Report which also recommended detention. The defendant responded to the Government's proffer and expressed skepticism about the points raised, but offered nothing more than unreliable conjecture to refute the Government's primary arguments.

However, rather than render a decision on the detention motion, the Magistrate Court inquired whether or not the defendant would be able to post bail on related state charges. The Magistrate Court granted a continuance of the hearing to June 26, 2020, to allow the defendant to update the court on the status of the defendant's bail on the state charges and to fashion proposed conditions of release on the federal matter.

Upon the defendant's representations that bail on the state prosecution remained set at $200,000 cash, bond, or signature bond, the Magistrate Court advised the defendant to be prepared to outline proposed conditions of release and have any sureties available for the June 26, 2020 continuation of the detention hearing.

On June 26, 2020, the Magistrate Court denied the Government's motion for detention and released the defendant upon conditions pending trial. *See* Dkt. 29. The Magistrate Court imposed conditions of release, including, *inter alia*, $25,000 signature bonds from three of the defendant's relatives, electronic monitoring, and home confinement. Upon request of the Government, the Court stayed its decision pending appeal until June 30, 2020.

Because there are no conditions or combination of conditions, including those set by the Magistrate Court, that can reasonably assure the safety of the community or the appearance of the defendant as required, the Government now provides this memorandum in support of its motion for review of the Decision and Order releasing the defendant from custody.

## II. <u>STANDARD OF REVIEW</u>

Review of a magistrate judge's release order is *de novo*. "[W]here a defendant is ordered released by a magistrate judge, the Government may, under 18 U.S.C. § 3145(a)(1), move for revocation of the release order before the district court. Upon such motion, the district court must perform a *de novo* review of the magistrate judge's release order." *United States v. Boorman*, 130 F. Supp. 2d 394, 398 (W.D.N.Y. 2001) (citing *United States v. Leon*, 766

F.2d 77, 80 (2d Cir.1985)).  In *United States v. Leon*, the Second Circuit held that a district court should "not simply defer to the judgment of the magistrate, but reach its own independent conclusion." *Leon*, 766 F.2d 77, 80 (2d Cir.1985); *see also United States v. Colombo*, 777 F.2d 96, 100 (2d Cir. 1985). The reviewing district court is also not limited to the record made at the magistrate court. Rather, the Court may take additional evidence or conduct a new evidentiary hearing altogether. "When making its *de novo* review, the district court may rely on the record of the proceedings before the magistrate judge and may also accept additional evidence." *Boorman*, *supra*, 130 F. Supp. 2d at 398; *see also Colombo* 777 F.2d 96, 98 (2d Cir. 1985).

## III.     GOVERNING STANDARDS

When the Government's motion for detention is based upon the defendant's dangerousness, it "has the burden of establishing defendant's dangerousness by 'clear and convincing evidence.'" *United States v. Chimurenga*, 760 F.2d 400, 403 (2d Cir. 1985); *see also* 18 U.S.C. § 3142(f). When the government's motion for detention is based upon the defendant's risk of flight, the "government's burden of proof . . . is not by clear and convincing evidence, but rather by a preponderance of the evidence." Chimurenga, 760 F.2d at 405.

In making a determination as to whether a defendant should be released, the Court must consider the factors enumerated under 18 U.S.C. § 3142(g). The four factors are, in relevant part:

(1)     the nature and circumstances of the offense charged;

(2)     the weight of the evidence against the person

(3)      the history and characteristics of the person including

        (A)     the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings;

        (B)     whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence…

(4)      the nature and seriousness of the danger to any person or the community that would be posed by the person's release

18 U.S.C. § 3142(g).

Significantly, when the Government seeks to establish that a defendant is a danger, it need not show a record of violence or dangerous conduct. "Although a prior record of violence eases the Government's burden of showing dangerousness, it is not essential." *Rodriguez, supra*, 950 F.2d 85, 88–89 (2d Cir. 1991). A charge such as the one the defendant faces carries a high penalty that can give rise to strong motives for flight and, accordingly, supports pretrial detention. *See United States v. Sabhnani*, 493 F.3d 63, 76 (2d Cir. 2007); *see also United States v. Duranseau*, 26 F.3d 804, 808 (8th Cir. 1994) (agreeing that offense punishable by up to ten years in prison constitutes a serious offense); *United States v. Melguizo*, 824 F.2d 370, 371 (5th Cir. 1987) ("We find that a possible sentence of ten years is also sufficient indication that an offense is serious.").

Whether bail conditions adequately address concerns about a defendant's risk of flight is separate from the question of whether such conditions adequately protect the community. The Second Circuit has "expressly held in several cases that a bail package that might

'reasonably assure the appearance of [the defendant] at trial, will not reasonably assure the safety of the community." *Mercedes*, 254 F.3d at 436-37; *see also United States v. Ferranti*, 66 F.3d 540, 543 (2d Cir. 1995) ("The $1,000,000 bond [secured by property of the defendant and his immediate family] would have deterred flight, not danger.") and *Rodriguez, supra*, 950 F.2d at 89 (vacating order of release defendant because "the existence of four cosigners and $10,000 cash may assure the appearance of [defendant] at trial but will not secure the safety of the community.").

Although the evidence presented at the detention hearing was not as extensive as the information that follows, primarily due to the fact that the information presented should have been sufficient to warrant detention and because the investigation remains ongoing, the Government now sets forth further basis for the defendant's detention. As the law allows, the Government asks the Court to consider this additional evidence in support of its motion. *See Boorman, supra*, 130 F. Supp. 2d at 398. Moreover, due to the ongoing nature of this investigation, the Government requests that the Court allow the Government to supplement this memorandum at a later date to provide the Court with updated investigative information.

## IV.  ARGUMENT

The Magistrate Court failed to properly assess the four factors set forth under 18 U.S.C. § 3142(g). More specifically, when assessing the facts and circumstances of the case and the weight of the evidence, the Magistrate Court wholly ignored that the defendant is charged not only with possessing the firearm as a prior felon, but also under the theory that she aided and abetted the offense of felon in possession of a firearm. In addition, the

Magistrate Court engaged in rife speculation in order to assuage its concerns regarding the defendant's extremely dangerous conduct. Contrary to the Magistrate Court's determination, the evidence establishes by clear and convincing evidence that the defendant is a danger to the community. The evidence also establishes by a preponderance of the evidence that she is a risk of flight. As a result, this Court should, therefore, revoke the Decision and Order of the Magistrate Court and order the defendant detained pending trial.

1)      **First Factor:  Nature and Circumstances of the Offense**

The firearm charge against the defendant stems from events which occurred in the wake of civil unrest following protests and demonstrations on June 1, 2020 in Buffalo, New York. Days prior to that evening, Erie County Executive Mark Poloncarz issued an emergency countywide state of emergency and curfew from 10:30 p.m. on May 30, 2020 to 7:00 a.m. on May 31, 2020. *See* Exhibit A. In the Local Emergency Order, Executive Poloncarz stated that "[t]he public safety of the residents of Erie County is presently imperiled[,] due to "civil unrest manifesting in violent protests, riots, and destruction of property within the County of Erie." Executive Poloncarz issued a further Local Emergency Order, discussing curfews from May 30, 2020 to June 2, 2020. *See* Exhibit B.


On the evening of June 1, 2020, after the curfew went into effect, members of the New York State Police ("NYSP") and Buffalo Police Department ("BPD") responded to the area of Bailey Avenue near the BPD E-District stationhouse to address crowds blocking the vehicular traffic and violating curfew. Law enforcement in riot gear, surrounded by law enforcement vehicles with flashing lights, formed a boundary on Bailey Avenue near Decker

Street and were attempting to disperse individuals congregating in the street. Over the course of several minutes, law enforcement advanced to Decker Street and demonstrators retreated southbound on Bailey Avenue.

During that several minute period, an SUV operated by the defendant and occupied by co-defendants Stewart (front seat passenger) and Pigram (rear passenger) remained stationary, idling beside an Niagara Frontier Transportation Authority ("NFTA") bus facing northbound toward the demonstrators and law enforcement in the vicinity of Manhart Street, a distance of over 250 feet from the police line. Numerous vehicles caught in the traffic congestion caused by the standoff between demonstrators and police either turned around and headed back southbound on Bailey Avenue or turned off on to side streets, thereby avoiding the police line.

The evidence (video, forensic, ballistics and testimonial) demonstrates that after the defendant's SUV sat idling for several minutes, co-defendant Pigram opened the rear driver side passenger door of the defendant's vehicle and discharged 10 rounds from a stolen 9mm handgun. After discharging those rounds, Pigram closed the rear driver passenger door. After the defendant's rear passenger concluded firing all the shots, and after the defendant's passengers secured their doors shut, the defendant propelled her vehicle into the oncoming southbound lane of traffic and proceeded northbound in the wrong lane of travel, coming dangerously close to striking a southbound vehicle. Rather than turn around as other vehicles had done and rather than turning off onto a side street, the defendant accelerated northbound in the oncoming lane of vehicular traffic, bypassing other vehicles that continued to wait in

the gridlock, and gaining speed toward the law enforcement line. The defendant continued accelerating in the wrong lane of travel in the direction of the law enforcement line, eventually running over and fracturing the pelvis of a NSYP trooper and injuring a BPD police officer. As previously stated, the distance was more than 250 feet. As the defendant's vehicle struck the police line, law enforcement fired 4 shots at the vehicle, striking the defendant twice, once in the abdomen and a graze wound across her shoulders. Despite being wounded, the defendant drove on northbound unabated at a high rate of speed, fleeing from the scene, and turned her vehicle onto Connelly Avenue. She continued to accelerate westbound on Connelly Avenue before bringing the vehicle to a stop midway down the block.

The defendant and the front seat passenger, Stewart, were immediately taken into custody by pursuing police units. The defendant's rear passenger, Pigram, exited the vehicle through the front passenger door over Stewart and fled on foot. Pigram attempted to hide in the heavy brush along the Kensington Expressway, before fleeing across the expressway with BPD in close foot pursuit. Pigram was apprehended a short time later with the help of aerial helicopter assistance provided by the Erie County Sheriff's Office ("ECSO") and United States Customs and Border Patrol ("CBP").

Subsequent to the apprehension of the defendant and two passengers, NYSP recovered a loaded Smith and Wesson, 9mm, semi-automatic pistol from the floor behind the defendant's driver's seat. NYSP also recovered a spent shell casing in the rear passenger area of the vehicle and a spent shell casing on top of the vehicle, both consistent with 9mm ammunition. Farther south on Bailey Avenue, in the vicinity where the defendant's vehicle

was parked beside the NFTA bus, law enforcement recovered a quantity of 7 spent 9mm shell casings and an additional spent 9mm shell casing in the vicinity of where the defendant struck the police line, which is believed to have rolled off the top of the SUV after being deposited there during the earlier discharges.

The defendant's knowing and deliberate actions in driving the vehicle through the police line in an attempt to effectuate the escape of her co-defendant demonstrate not only the defendant's dangerousness, but also demonstrate that she poses a risk of flight. The defendant's deliberate actions in driving a large SUV more than 250 feet toward a line of police had obviously foreseeable and dangerous consequences: death or protracted disfigurement. Following her arrest, the defendant spoke to law enforcement. She admitted she was parked stationary for several minutes on Bailey Avenue, that everything appeared "normal," and she observed the police lights and people in the street before driving her vehicle toward the police line.

Possession of a firearm by a felon carries with it a maximum of 10 years of imprisonment. The significant sentence the defendant faces is an important factor in determining the defendant's risk of flight. *See United States v. Dodge*, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight). In addition, the defendant's actions in fleeing from police also evince the risk she poses regarding flight. Based on the foregoing, the nature and circumstances of the offense weigh in favor of detention.

## 2)    Second Factor:  Weight of Evidence

Contrary to the Magistrate Court's assessment of the evidence, the proof of the defendant's constructive possession and aiding and abetting Pigram's unlawful possession of the firearm is compelling. The video evidence, from multiple vantage points, demonstrates that the police presence across Bailey Avenue at Decker Street was clearly visible. The defendant corroborated as much in her post-arrest interview with NYSP. The videos also support the facts described in the preceding section, including three two social media recordings and the NFTA bus surveillance footage, which corroborate the audible discharge of 10 shots at the time the defendant's rear driver door is ajar. Muzzle flashes also appear visible in the NFTA footage.

Photographs document the location and recovery of physical evidence described in the preceding section (e.g., firearm, ammunition, spent shell casings). DNA analysis of the firearm and magazine confirmed that while the defendant and Stewart are excluded from the mixture of genetic material, Pigram's DNA cannot be excluded. Firearms testing confirmed the loaded firearm was operable and ballistics comparisons concluded that one of the 9mm shell casings recovered on Bailey Avenue in the vicinity of where the defendant was parked beside the bus was fired from the recovered firearm. Additionally, the spent 9mm shell casing recovered inside the defendant's vehicle and the spent 9mm shell casing recovered from the top of the defendant's vehicle were also fired from the recovered firearm.

In the defendant's post-arrest interview with NYSP, she claims she was shot twice before driving off. This claim is belied the video evidence and physical evidence. The NFTA

video clearly shows the defendant's vehicle drive off following Pigram's successive firearms discharges without any damage to the windshield or the side windows. There are also no audible gunshots aside from Pigram's 10 discharges. Furthermore, NYSP conducted a shooting reconstruction based on the physical evidence. The evidence from the reconstruction, of which there are photos, demonstrates that the defendant was shot and struck by police discharges *after* she breached the police line. The defendant's account of events, at several crucial junctures, is refuted by the ballistics evidence and the shooting reconstruction. Furthermore, the video evidence shows that the vehicle is undamaged when it lurched into the wrong lane of travel and began accelerating toward the police line.

Additionally, during the defendant's post-arrest interview, when questioned by NYSP investigators, the defendant implausibly denied hearing any shots coming from her own vehicle. She identified her passengers (Stewart and Pigram) by name, designated where they were seated in the vehicle, and described them as her husband's friends. At no point during the interview does she express that she was coerced or under duress. At no point during the interview does she intimate that she was afraid of Stewart or Pigram. Nevertheless, the Magistrate Court speculates, "it is possible that once the shots were fired, Davis panicked or was in fear of Pigram (who was likely the shooter)." However, that unsupported speculation is not borne out by the evidence presented. Instead, the NFTA bus video shows that the defendant's vehicle, which she admitted operating, remains stationary as Pigram discharges the firearm from the open door directly behind where she is seated. The defendant's vehicle does not budge after one shot, after two shots, or after 9 shots. It is only after Pigram discharges a tenth shot, gets back in the vehicle, and secures the door that the defendant pulls

off. A full five seconds of discharges. She was not startled. She did not panic and hit the gas. The defendant waited for the shots to conclude and for her co-defendant to reestablish himself in the vehicle before moving. As previously indicated, as well, the defendant was not struck by gunfire, causing her to pull off and continue accelerating toward police. She was not struck with any bullets until she drove through the police line. Finally, the defendant implausibly denied knowing she struck anything or anyone.

As this Court is no doubt aware, possession, within the meaning of 18 U.S.C. § 922, "can be either actual, constructive or joint." *United States v. Pelusio,* 725 F.2d 161, 167 (2d Cir.1983) (citations and internal quotation marks omitted). *See also United States v. Speer,* 30 F.3d 605, 611 (5th Cir.1994) (defendant had constructive possession of weapon where defendant was driver of vehicle in which passenger was in visible possession of firearm). In addition, "constructive possession exists when a person ... knowingly has the power and intention at a given time to exercise dominion and control over an object, either directly or through others." *Pelusio,* 725 F.2d at 167 (citations and internal quotation marks omitted). *See Parsons v. United States*, 919 F.Supp 86, 91 (N.D.N.Y 1996).

In *United States v. Gaines*, 295 F.3d 293, 300 (2d Cir. 2002), the court held that constructive possession, "exists when a person has the power and intention to exercise dominion and control over an object, [which] may be shown by direct or circumstantial evidence." Citing *United States v. Payton*, 159 F.3d 49, 56 (2d Cir.1998). Thus, under constructive possession, an individual can possess a gun within the meaning of the statute

without ever physically handling the firearm. In addition, under this theory, possession need not be exclusive. *Id.* (emphasis added).

In making a determination regarding constructive possession the court will consider whether the defendant exercised dominion and control "over the premises in which the firearms are located." *United States v. Layne*, 192 F.3d 556, 571 (6th Cir.1999); *see also United States v. Adkins*, 196 F.3d 1112, 1118 (10th Cir.1999); *United States v. Wight*, 968 F.2d 1393, 1398 (1st Cir.1992) (collecting cases). It is of no moment that other individuals also may have exercised control over the weapons. *See Payton*, 159 F.3d at 56; *United States v. Kitchen*, 57 F.3d 516, 521 (7th Cir.1995) ("Constructive possession may be either sole or joint."). The government may establish constructive possession through direct or circumstantial evidence. *See Payton*, 159 F.3d at 56.

Further, there is sufficient evidence that the defendant, the operator of the vehicle, constructively possessed the recovered firearm. *See United States v. Sherod*, 110 F.3d 61 (4th Cir.1997) (defendant, as vehicle's driver, exercised extensive dominion and control over the car, sufficiently establishing constructive possession of its contents); *United States v. Hiebert*, 30 F.3d 1005, 1009 (8th Cir.1994) (finding constructive possession because firearm was "found in the vehicle that [the defendant] was driving"). *United States v. Speer*, 30 F.3d 605, 611 (5th Cir.1994) (defendant had constructive possession of weapon where defendant was driver of vehicle in which passenger was in visible possession of firearm).

Ultimately, the firearm was located in close proximity to all three occupants of the defendant's vehicle. Based on the video/audio and ballistic evidence, the firearm was fired from the vehicle (ten times over the course of five full seconds). That the occupants of the defendant's vehicle claimed ignorance of the presence of the firearm following its repeated discharge defies belief. The firearm was recovered in a place where each occupant had access to it. The firearm's location on the back seat floor and the extreme actions of the defendant in operating her vehicle to avoid apprehension and recovery of the weapon is consistent with all three occupants jointly and constructively possessing the firearm.

The Magistrate Court also wholly ignored that the defendant is charged with aiding and abetting the offense as well. In order to aid and abet, one must do more than merely be present at the scene of the crime and have knowledge of its commission. The Supreme Court set out the standard for the offense in *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949), when it quoted Judge Learned Hand's statement from *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938): "In order to aid and abet another to commit a crime it is necessary that a defendant 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed'." The government must prove "some active participation or encouragement, or some affirmative act by (the defendant) designed to further the (crime)'." *United States v. Morrow*, 923 F.2d 427, 436 (6th Cir. 1991).

Here, as aforementioned, the defendant was aware the firearm was in the vehicle. Whether she knew the firearm was there from the time she agreed to give Pigram a ride is

inapposite. The defendant was made aware of the gun's presence at the very latest when Pigram, seated directly behind her, opened the door and discharged the firearm 10 times in succession over the span of five full seconds. That much is clear because the defendant took drastic action to prevent the recovery of the firearm, speeding away in the wrong lane of travel, nearly colliding with another vehicle, and continuing on striking law enforcement officers in her efforts to avoid apprehension (and the apprehension of the other occupants of the vehicle).

The defendant made no effort to stop after she struck and literally ran over someone (though she incredibly claims she was unaware she struck anything). Instead, the defendant continued speeding away and deliberately turned her vehicle onto a side street in an effort to escape. Further, the defendant drove to a less well-lit area, pulled her vehicle to the curb and allowed Pigram to exit the vehicle and flee on foot. When interviewed by NYSP, the defendant's denials regarding her knowledge or awareness that shots were discharged from her vehicle and that one of her passengers possessed a firearm effectively served to protect Pigram against incrimination. Rather than inculpate her passenger, the defendant's responses, her implausible denials, served to protect him. Each of the defendant's actions demonstrate that the defendant was more than merely present or aware of Pigram's commission of the offense. On the contrary, the defendant served as Pigram's getaway driver and lied to the police when questioned in order to obstruct the investigation. In other words, she aided and abetted his commission of the crime.

As the operator of the vehicle in which the firearm was recovered, the defendant was the custodian of the vehicle and exercised dominion and control over it and its contents.

Moreover, the defendant's actions illustrate that she engaged in deliberate conduct designed to avoid apprehension, not that she was involved in an accident or feared Pigram, as the Magistrate Court speculated (and for which there is no supporting proof). Based on the foregoing, this factor weighs in favor of the defendant's detention.

### 3) <u>Third Factor</u>: History and Characteristics of the Defendant

#### A. *Mental Condition*

The defendant reported to USPO in the Pretrial Services Report that she was uncertain if she was ever diagnosed with a mental illness. What is troubling is that her mother reported she was diagnosed with bipolar disorder, manic depression, and severe depression. Yet, there is no indication, despite such serious diagnoses, that the defendant is undergoing any mental health counseling or prescribed any anti-psychotics or other medications to address such serious underlying mental disease.

#### B. *Work History*

The defendant is 31 years old and in the Pretrial Services Report described having no work history or income based on employment. However, during the defendant's proffer to the Magistrate Court, counsel reported that the defendant is self-employed and sells merchandise on the internet and provided exhibits to support that she was self-employed. None of the defendant's income from her internet retail sales or history of self-employment was reported to USPO. In addition, the defendant failed to report prior employment or income related to providing cosmetology services (installing false eyelashes) or exotic dancing.

### C.    *Drug or Alcohol Use*

In the Pretrial Services Report, the defendant admitted consuming alcohol and she admitted obtaining treatment for alcohol abuse in her past, but denied any other use of illicit drugs. However, when interviewed by NYSP following her arrest in this case, the defendant admitted consuming liquor, marijuana, and ecstasy on date of the incident prior to driving her vehicle. A blood sample was also drawn from the defendant at the hospital following her arrest and submitted to the Erie County Toxicology Lab for analysis. Preliminary results identify cocaine metabolites, synthetic cathinone (MDMA), and morphine/fentanyl in the defendant's sample. In other words, the defendant intentionally misled USPO and underreported her used of illicit substances on the date of the incident to NYSP.

### D.    *Criminal History*

The defendant was previously convicted of Attempted Robbery in the Second Degree, a class D violent felony in Erie County Court on March 15, 2010. The underlying facts of the case reveal that the defendant and another teenage female forcibly stole a purse and credit card from another young woman. The defendant was placed on five years of probation for that offense. Despite being convicted of crimes on two subsequent occasions, the defendant's probation was inexplicably never revoked.

As referenced, the defendant has been convicted of several misdemeanors, including attempted petit larceny in 2015 and two counts of attempted tampering with a witness in 2014 (all three crimes having been committed while under probation supervision). The 2014 convictions for witness tampering are particularly troubling. There, the defendant's then-

boyfriend, an associate of the Bloods gang, was set for trial in Erie County Court on serious drug charges related to his possession of a substantial amount of crack cocaine. Prior to trial, the prosecution, pursuant to its obligation to do so, provided the defense *Rosario* material, i.e., witness statements. The defendant received the sworn testimony of three civilian witnesses from her boyfriend, all of whom were prepared to testify against him at trial. The defendant, at her boyfriend's direction, disseminated the statements on social media, including Facebook, with a caption identifying the civilians and outing them as snitches. Subsequently, all three witnesses were threatened by strangers and expressed reluctance or unwillingness to testify at the narcotics trial for fear of reprisal.

One of the civilians reported receiving in-person threats that if he testified he would be subjected to physical harm and, as a direct result, that witness could not be located leading up to the time of trial. Following a *Sirois* hearing, the County Court found that the defendant's actions at the behest of her boyfriend (his misconduct) and the subsequent threats the witness received rendered the prosecution witness unavailable and the prosecution was permitted to introduce the unavailable witness' sworn grand jury testimony in its case-in-chief without cross-examination—an exceedingly rare finding. In posting the witness' statements, the defendant knew she would instill fear and invite retribution against them, all in an effort to cripple the prosecution against her boyfriend. As denoted, she was subsequently convicted following a bench trial of lesser included offenses of her felony witness intimidation charges. The defendant's actions constituted witness intimidation and tampering and undermined the entire foundation of our legal system.

### E. *Record of Court Appearances*

The defendant has one prior failure to appear in 2009 that resulted in a bench warrant. She remained out on a warrant for four months after she failed to initially appear.

### F. *Family and Community Ties*

Although the defendant has ties to the community, "Congress specifically found when adopting the Bail Reform Act of 1984 that a defendant's 'community ties' have 'no correlation with the question of the safety of the community.'" *United States v. Hill*, 10-CR-191-A, 2011 WL 5403276, at * 9 (W.D.N.Y. Nov. 7, 2011) (Arcara, J.). Even if the defendant has strong family and community ties, these ties have not deterred her from engaging in criminal activity.

### 4) <u>Fourth Factor</u>: Nature and Seriousness of the Danger to Any Person or the Community

As detailed above, the serious nature of this offense alone demonstrates that the defendant poses a danger to the community. The defendant deliberately disregarded a curfew imposed by the County Executive that was in effect for days leading up to the incident and which was reported on by nearly every news outlet following days of unrest and constant broadcasting. The defendant drove on a public roadway after voluntarily consuming alcohol and illicit drugs. The defendant then deliberately maneuvered her vehicle into the wrong lane of traffic and accelerated toward a crowd and police vehicles she knew were there, nearly colliding with another vehicle in the process, before driving through the police line and striking and seriously injuring a police officer. She then sped away from the collision and attempted to avoid apprehension (for both herself and her passengers). This defendant has demonstrated a history of placing others in danger: robbery, witness intimidation, and this

offense which resulted in serious injuries to law enforcement. The bonds discussed below will not mitigate that danger. This factor, too, weighs heavily in favor of the defendant's detention.

**5)      The Bonds Imposed by the Magistrate Court are Insufficient to Protect Society or Assure the Defendant's Appearance**

The Magistrate Court allowed the defendant's release to her residence[2] where she will be required to abide by electronic monitoring and home confinement, among other more standard conditions. The defendant's father, mother, and grandmother also committed to signing a $25,000 signature bond. These conditions are insufficient to ensure the safety of the community and the defendant's reappearance.

As an initial matter, the Magistrate Court did not conduct a thorough colloquy to determine if the defendant's family members would be capable of paying any amount towards the $25,000 bond imposed should the defendant violate a term or condition of release. No inquiry took place as to the family members' income or what assets or collateral they had in place. Because there is no assurance that these individuals are capable of paying the bond should the defendant violate a condition of release, the signature bond lacks sufficient collateral. *See United States v. Malizio*, 2013 U.S. Dist. LEXIS 148324, *9-15 (W.D.N.Y. Oct. 15, 2013) (finding that a signature bond failed to operate as sufficient collateral).

Next, even assuming a judgment can be entered and money can be secured from these individuals, a total of $75,000 in signature bonds is inadequate to secure the defendant's

_____

[2] This, despite the fact that an Order of Protection against her husband, who also resides at the address, expired roughly six months ago.

appearance and protect society due to the nature of this case. Electronic monitoring, along with this small collateral, will not mitigate the defendant's danger to the community or risk of flight. *See United States v. Ellison*, 2018 U.S. Dist. LEXIS 28787, *11 (W.D.N.Y. Feb. 22, 2018) (finding that "electronic monitoring while on home detention or home incarceration, even with relatives posting financial security, will not eliminate the specific danger that the defendant poses to the community."). Insufficient bail packages do little to assure the safety of the community. *See Rodriguez, supra*, 950 F.2d 85 at 89 (finding that four cosigners and a $10,000 cash bond "will not secure the safety of the community.").

The defendant chose to protect a dangerous criminal not once, but twice. Previously, she put the lives of witnesses at risk in her then-boyfriend's serious felony drug trial. Here, the defendant's husband's friend fired live rounds from a stolen handgun in a busy public roadway during a time of tumult, placing everyone who was present in vehicles and on foot in danger. Rather than attempt to mitigate the danger to others, the defendant chose to compound it, accelerating her vehicle toward a line of police officers and police emergency lights, effectuating the (attempted) escape of a violent criminal. In doing so, the defendant was not hindered by striking and seriously injuring a member of law enforcement. She aided and abetted Pigram's possession (and discharge) of the illegal firearm as a felon. Undoubtedly, fully aware of Pigram's possession of the firearm in her vehicle and endeavoring to facilitate his escape from capture, the defendant also constructively possessed the firearm. There is no reasonable assurance that the defendant does not constitute a continuing danger to the community or a pose a risk of flight. There is no reasonable assurance that she will abide by the conditions of release imposed by the Magistrate Court.

## CONCLUSION

The release of the defendant poses a risk of flight and a serious risk of danger to the community. No condition or combination of conditions can lessen this risk to a point where the defendant's appearance, or the safety of the community or other individuals, can be reasonably assured. The posting of signature bonds, along with electronic monitoring and home confinement, are insufficient assurances. For the reasons stated above, the Government respectfully requests that the District Court revoke the Magistrate Court's decision, and order the defendant be detained pending trial. Additionally, because the Government is not in receipt of the transcript from the detention proceedings and because this investigation is ongoing, the Government requests the opportunity to supplement this memorandum at a later date to provide the Court with updated investigative information.

DATED:  Buffalo, New York, June 30, 2020.

JAMES P. KENNEDY, JR.
United States Attorney

BY:  *s/SETH T. MOLISANI*
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
716/843-5881
Seth.Molisani@usdoj.gov